IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

EARNEST JOHNSON, by and through his
wife and next friend, GLORIA JOHNSON,
on behalf of the wrongful death
beneficiaries and as Administratrix
of the Estate of Earnest Johnson                              PLAINTIFF

VS.                          CIVIL ACTION NO. 5:06-cv-161(DCB)(JMR)

MARINER HEALTH CARE, INC., f/k/a
Mariner Post Acute Network;
MARINER HEALTH GROUP, INC.;
NATIONAL HERITAGE REALTY, INC.;
MARINER HEALTH CARE MANAGEMENT
COMPANY; those operating subsidiaries
of Mariner Health Care, Inc., and
Mariner Health Group connected with
the ownership or operation of Yazoo
City Health and Rehabilitation Center                        DEFENDANTS

ORDER

This cause is before the Court on the defendants' motion to exclude testimony and opinions of the plaintiff's expert, David W. Seignious, M.D. **(docket entry 45)**.  Having carefully considered the motion and response, the memoranda of the parties and the applicable law, and having heard testimony in open court, the Court finds as follows:

This is a nursing home negligence case.  Earnest Johnson was a resident of the Yazoo Health and Rehabilitation Center from September 24, 1999, until his death on June 26, 2004.  The plaintiff alleges that due to the defendants' negligence, decubitus ulcers (pressure sores) on Earnest Johnson's feet worsened and became infected, leading to amputation of both of his legs.  The

plaintiff offers Dr. David W. Seignious as a medical expert qualified to testify as to the standard of care, breach thereof, and causation.  In their motion, the defendants move to exclude certain testimony and opinions of Dr. Seignious pursuant to Fed.R.Evi. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Dr. Seignious has testified that due to the defendants' failure to provide adequate pressure reduction by turning Mr. Johnson in his bed, Mr. Johnson's left foot Stage II decubitus ulcer progressed to a Stage IV decubitus ulcer.  Dr. Seignious has also testified that due to the defendants' negligence, the decubitus ulcers on Mr. Johnson's left and right feet became infected, ultimately leading to amputation.

Fed.R.Evi. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court has stated that Rule 702 should be employed by trial judges to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  Daubert, 509 U.S. at 593.  Daubert sets forth a non-exhaustive, "flexible" list of factors that district courts may use in analyzing the

reliability of an expert's proffered testimony, including "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (2) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community."  Pipitone v. Biomatrix, Inc., 288 F.3d 239, 244 (5th Cir. 2002)(citing Daubert, 509 U.S. at 593-94; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-49 (1999)).

   The defendants argue that Dr. Seignious fails to identify a breach of the standard of care that caused Mr. Johnson's injuries, and offers no theory of causation except that Mr. Johnson's injuries would not have occurred without negligence.  This, according to the defendants, is mere ipse dixit (something asserted but not proved), see Kumho Tire, 526 U.S. at 157, and is not based upon sufficient facts or data as required by Rule 702.  The defendants also assert that Dr. Seignious bases his opinion solely on his experience, learning and knowledge, and does not support it with any journals, textbooks or treatises.

    Finally, the defendants show that Mr. Johnson had a number of advanced diseases that made it more likely for his decubitus ulcers to progress, including diabetes, end-stage dementia, strokes, seizures, hypertension, renal failure, and congestive heart failure.  When asked if these could have contributed to the progression of Mr. Johnson's decubitus ulcers, Dr. Seignious

3

conceded that they could, but nevertheless adhered to his opinion that "without the breaches that I described, I don't believe [Mr. Johnson's diseases] made it inevitable." According to the defendants, this opinion is unsubstantiated and merely provides an ultimate conclusion without analysis, which is not allowed under Daubert. See Clark v. Takata Corp., 192 F.3d 750, 757 (7th Cir. 1999).

The defendants move for exclusion of Dr. Seignious's opinions that (1) the progression of the left foot decubitus ulcer to a Stage IV ulcer was caused by the nursing home's negligence; and (2) the infections in the decubitus ulcers in both of Mr. Johnson's feet were caused by negligence. The defendants also move for exclusion of all evidence that the amputations of Mr. Johnson's legs were caused by the nursing home's negligence

In response, the plaintiff refers to Dr. Seignious's report, which she claims sets forth several breaches of the standard of care. The report states that Mr. Johnson had no contractures when he entered the nursing home, but he developed "avoidable" contractures while under the nursing home's care, which put pressure on his skin and made him more susceptible to developing decubitus ulcers. The report also cites the defendants' failure to provide exercise therapy to prevent the development of pressure sores, which led to their development as well as to the worsening of the contractures. Other alleged breaches of the standard of

care include the failure to provide adequate pressure reduction, and negligent wound care leading to infection of the ulcers.

The plaintiff also refers to Dr. Seignious's deposition, in which he states:

> There are some instances where Stage III and Stage IV ulcers are unavoidable, and frequently what I have quoted is actively dying individuals can get Stage III and Stage IV ulcers.  There are some ischemic ulcers, as I said earlier, which I believe would be unavoidable and are not due to pressure.  The pressure ulcers, specifically, I believe, much more likely than not are avoidable with adequate pressure reduction. ... I wouldn't say a hundred percent but I would say very usually.  I am sure there are some cases out there that I can't think of right now that are generally unavoidable. ... Specifically, ... this ulcer, I believe is avoidable.

Seignious Depo., pp. 59-60.

As for the alleged lack of supporting publications, the plaintiff quotes deposition testimony in which Dr. Seignious refers to the "General Internal Medicine Textbook ... pressure ulcer guidelines ... [and] treatises of the American Geriatric Society." Seignious Depo., pp. 63-64.

At the hearing on the defendants' motion, Dr. Seignious initially stated that although he believed Mr. Johnson had peripheral arterial disease, he saw no evidence of arteriosclerosis in the left foot until the amputation report of December 2002. Transcript, p. 23.  The defendants then produced ankle-brachial index findings obtained from Mr. Johnson at King's Daughters Hospital on October 7, 2002.  These showed a right ankle-brachial index of .58, which implies moderate impairment.  However, the

technician was unable to obtain a reading for the left ankle. Transcript, p. 24. Dr. Seignious admitted that he had not seen the document, because it had not been furnished to him. Transcript, p. 25. He also admitted that the document showed a decrease in blood flow to the left foot. Transcript, p. 28. He did not waver from his opinion, however, that there was no significant change in Mr. Johnson's peripheral arterial disease from March 2002 until August/September 2002. Transcript, pp. 29-30. When confronted with additional hospital records, from June and July of 2002, Dr. Seignious again admitted that they evidenced decreased blood flow to the left foot, but he also opined that they did not necessarily evidence a deterioration in Mr. Johnson's condition. Transcript, p. 32. However, when questioned further, Dr. Seignious admitted that due to "the natural course of [the] disease, there is going to be some worsening during this time frame [June to October 2002]." Transcript, p. 32. He also acknowledged that during those four months, "there is some degree of change because it is a progressive disease." Transcript, p. 33. Nevertheless, Dr. Seignious held to his opinion that there was not such a degree of change that would make an ulcer inevitable. Transcript, p. 33. He also offered the following explanation of his opinion:

> Again, I'm not saying this man did not have peripheral arterial disease. What I'm saying is I believe it was the pressure, and I said that in my deposition, it was the unrelieved pressure on top of his peripheral vascular disease or peripheral arterial disease which made the ulcer inevitable. I am not saying that he didn't have

6

>  any atherosclerosis.  I'm just saying in my deposition I
>  don't remember seeing these documents that would say he
>  had atherosclerosis.

Transcript, pp. 34-35.

Plaintiff's counsel then furnished Dr. Seignious with a pathologist report from the October 2002 amputation, which found that Mr. Johnson had severe arteriosclerosis in the left foot. Transcript, pp. 35-36.  Dr. Seignious took no issue with the diagnosis of severe arteriosclerotic disease. Transcript, p. 44. He also agreed that severe arteriosclerosis develops over a long period of time. Transcript, p. 44.

The hearing established that at the time of his deposition, Dr. Seignious did not have the benefit of certain relevant and material medical records, because they had not been furnished to him.  Having reviewed these records for the first time during his testimony at the hearing, Dr. Seignious continued to hold his opinion that with adequate pressure reduction, the decubitus ulcers would not have been inevitable.  Transcript, pp. 61, 68, 105. Similarly, he opined that with adequate wound care, the infections would not have been inevitable.  Transcript, p. 69.

At the hearing, Dr. Seignious also presented additional publications in support of his opinions: a paper on the Prevention and Rehabilitation of Pressure Ulcers (Transcript, p. 78); "Are Infections Inevitable in Ulcers?" (Transcript, p. 80); Harrison's Textbook of Medicine (Transcript, p. 88); and Practice of

Geriatrics (Transcript, p. 89).

The issues raised by the defendants go not to the qualifications of Dr. Seignious, but to the reliability of his findings. The paramount question is whether Dr. Seignious's opinions have an adequate factual basis. For example, does Dr. Seignious adequately explain how Mr. Johnson's multiple medical problems impacted the development and treatment of his ulcers? Does he adequately explain his theory of causation? After careful consideration, the Court cannot find at this stage that his opinions are so lacking in factual support as to be unreliable. However, there are fact issues which have yet to be developed. The preferred course is to allow Dr. Seignious to testify, so that the parties can flesh out his opinions. The defendants' motion shall therefore be denied without prejudice. Accordingly,

IT IS HEREBY ORDERED that the defendants' motion to exclude testimony and opinions of the plaintiff's expert, David W. Seignious, M.D. **(docket entry 45)** is denied without prejudice.

SO ORDERED, this the 7th day of May, 2008.

s/ David Bramlette
UNITED STATES DISTRICT JUDGE